AO 106 (Rev. 04/10) Application for a Search Warrant



# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Apple iPhone 5S, Model A1453, Cell Phone (614-815-0162),
Imei: 352034064531307, currently located at FBI Cincinnati
Division, Columbus Resident Agency, 425 W. Nationwide
Blvd, Columbus, Ohio

)
)
)
)
)
)
)

Case No.  2:16·MJ·582

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. 2339B | Providing material support and resources to a designated foreign terrorist organization. |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

T. Gregory Naples, Jr. FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: November 29, 2016

City and state: Columbus, OH

*Judge's signature*

Elizabeth Preston Deavers, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF **APPLE iPHONE 5S, MODEL A1453, CELL PHONE (614-815-0162), IMEI: 352034064531307,** CURRENTLY LOCATED AT FBI CINCINNATI DIVISION, COLUMBUS RESIDENT AGENCY, 425 W. NATIONWIDE BLVD, COLUMBUS, OHIO | Case No. _____ <br><br> **UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41

## FOR A WARRANT TO SEARCH AND SEIZE

I, T. Gregory Naples, Jr., being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     The Affiant makes this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of Apple iPhone 5s, Model A1453, Cell Phone (614-815-0162), IMEI 352034064531307 (hereinafter "Subject Device") and the extraction from that device of electronically stored information, located in the Southern District of Ohio and further described in Attachment A, for evidence, fruits or instrumentalities of conspiracy, provision and attempted provision of material support and resources to a designated foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B, as more particularly described in Attachment B.

1

2.      The Affiant is a Special Agent with the Federal Bureau of Investigation (FBI), Cincinnati Division, Columbus Resident Agency.  The Affiant has been a Special Agent for 14 years and has been assigned to an International Terrorism Squad for six years and Joint Terrorism Task Forces (JTTF) for eight years in both Washington, DC and Columbus, OH.  The Affiant has been involved in the preparation and execution of numerous federal search warrants for various types of violations.  During his current assignment to the JTTF, the Affiant has been a Case Agent and Co-Case Agent for multiple international terrorism investigations.  While assigned to the JTTF, the Affiant has received specialized training in international terrorism. Furthermore, the Affiant has received training in computer-related crime as well as the criminal use of email, social media, encrypted messaging applications, and telephonic communications.

3.      The statements contained herein are based on an investigation conducted by the Affiant and others, on his experience and training as a Special Agent on the JTTF, and on other relevant information provided to him by other FBI Special Agents and law enforcement officials.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of the Affiant's knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 2339B (providing, attempting to provide, and conspiring to provide material support to a Foreign Terrorist Organization ("FTO") have been committed by ABDUL RAZAK ALI ARTAN (hereinafter referred to as "ARTAN").  There is also probable cause to search the Subject Device, as described in Attachment A, for evidence of these crimes, as described in Attachment B.

2

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5.     The applied-for warrant would authorize the forensic examination of the Subject Device, an Apple iPhone 5s, Model A1453, Cell Phone (614-815-0162), IMEI 352034064531307 for the purpose of identifying electronically stored data particularly described in Attachment B.

## DESIGNATED FOREIGN TERRORIST ORGANIZATION

6.     On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.

7.     On May 15, 2014, the Secretary of State amended the designation of AQI as a FTO to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. In an audio recording publicly released on June 29, 2014, ISIL announced a formal change of its name to Islamic State.   On or about September 21, 2014, ISIL spokesperson Abu Muhammad al-Adnani called for attacks against citizens—civilian or military—of the countries participating in the United States-led coalition against ISIL.   On September 21, 2015, the Secretary added the following aliases to the ISIL listing: Islamic State, ISIL, and ISIS.  To date, ISIL remains a designated FTO.

3

## PROBABLE CAUSE

8.     On November 28, 2016, at approximately 9:42 a.m., a black male subject was driving a vehicle in the area of the intersection of West 19th Avenue and College Road North on The Ohio State University campus. According to reports from the scene, the subject purposely struck and attempted to strike multiple pedestrians with the moving vehicle. The subject subsequently exited the vehicle and stabbed and attempted to stab numerous people with a knife. A local officer responded to the scene, encountered the subject, and fatally wounded him. A driver's license found on the person of the subject identified him as ABDUL R. ALI ARTAN, date of birth January 1, 1998, Ohio Driver's License #UJ847597, with an address of 353 Nationwide Boulevard, Columbus, Ohio. An Apple iPhone 5s, the Subject Device, was also found in the vehicle with ARTAN. As a result of the attack, approximately nine (9) victims were transported to the hospital, one in critical condition.

9.     FBI conducted a search for any social media presence/activity related to ARTAN and identified the following Facebook page as belonging to him: https://www.facebook.com/abdi.razaq.3 . The photo on the Facebook page appeared to match the photo of ARTAN from the driver's license recovered from him at the scene of the attack. At approximately 9:30 AM to 9:45 AM, which appears to be the time period just prior to the attack, ARTAN made a public Facebook post which stated in its entirety:

In the name of Allah, the most merciful and the most gracious.

(Screenshot this before it gets deleted)

My brothers and sisters, I am sick and tired of seeing my fellow Muslim brothers and sisters being killed and tortured EVERYWHERE. Seeing my fellow Muslims being

4

tortured, raped and killed in Burma led to a boiling point. I can't take it anymore.

America! Stop interfering with other countries, especially the Muslim Ummah. We are not weak. We are not weak, remember that.

If you want us Muslims to stop carrying lone wolf attacks, then make peace with "dawla in al sham." Make a pact or a treaty with them where you promise to leave them alone, you and your fellow apostate allies.

By Allah, we will not let you sleep unless you give peace to the Muslims. You will not celebrate or enjoy any holiday.

Stop the killing of the Muslims in Burma.

Btw, every single Muslim who disapproves of my actions is a sleeper cell, waiting for a signal. I am warning you Oh America!

Ano, a message to the Muslims, don't listen to celebrity scholars who sold their deen. I am talking about the likes of Yasir Qadhi, Omar Sulleman, Nouman, Mufti Menk and the list goes on. Beware of Al-Maghrib Institute. Listen instead to our hero Imam Anwar Al-Awlaki.

Let me ask you this question if the Muhammad peace and blessings upon him and his Sahaba were here today, Wouldn't the Western Media call them terrorists?

To conclude.

By Allah, I am willing to kill a billion infidels in retribution for a single DISABLED Muslim/Muslimun.

(Screenshot this before it get deleted)

10.     Based on my training and experience, your Affiant understands the term "lone

5

wolf attacks" to refer to a terrorist who commits violent acts alone, even if he/she is influenced or motivated by an ideology or a terrorist organization. Additionally, your Affiant understands that the phrase "dawla in al sham" is another term for ISIL. Moreover, based on my training and experience, your Affiant also understands that the individual referred to as "Imam Anwar Al-Awlaki" is Anwar Al-Awlaki, the now-deceased American-born Islamic lecturer and Al Qa'ida in the Arabian Peninsula (AQAP) leader who espoused violent jihad against Westerners and encouraged the emigration of foreign fighters to countries around the world to engage in violent jihad. Based on my training and experience, your affiant is aware that many ISIL supporters watch and listen to recordings of Al-Awlaki's calls and purported justifications for engaging in violent jihad. AQAP also publishes an English language magazine called *Inspire* that contains propaganda espousing how to conduct various terrorist attacks.

11.     Based on my knowledge and experience, jihadist propaganda has long counseled followers to commit acts of violence like the one allegedly committed by ARTAN; i.e., by using vehicles and knives as weapons. For example, the Fall 2010 issue of *Inspire* Magazine, a publication by the media arm of AQAP, described such an operation. It encouraged jihadists to "use a pickup truck as a mowing machine, not to mow grass but to mow down the enemies of Allah." More recently, the Autumn 2016 issue of *Inspire* Magazine, encouraged "lone mujahids" to commit acts of violent jihad "using a truck as done by the Lone Mujahid in the Nice operation." Similarly, the July 2016 issue of *Dabiq*, ISIL's initial official magazine, praised the "brother" who answered "the Islamic State's calls to target nations participating in the Crusader coalition fighting the Caliphate" by "killing more than 80

6

people and injuring more than 300 others" in the Nice attacks. In September 2016, ISIL changed the name of its official magazine to *Rumiyah*. In November 2016, ISIL released *Rumiyah, Issue 3*, which has an article titled "Just Terror Tactics," which again focuses on a vehicle attack as a primary attack weapon with a secondary attack using a knife or gun to maximize the "kill count" and terror. Some of the highlights in the article state the following:

"Though being an essential part of modern life, very few actually comprehend the deadly and destructive capability of the motor vehicle and its capacity of reaping large numbers of casualties if used in a premeditated manner."

"The method of such an attack is that a vehicle is plunged at a high speed into a large congregation of kuffar, smashing their bodies with the vehicle's strong outer frame, while advancing forward – crushing their heads, torsos, and limbs under the vehicle's wheels and chassis – and leaving behind a trail of carnage."

"Applicable Targets: Large outdoor conventions and celebrations, Pedestrian-congested streets, Outdoor Markets, Festivals, Parades, Political Rallies"

"In a bid to ensure utmost carnage upon the enemies of Allah, it is imperative that one does not exit his vehicle during the attack. Rather, he should remain inside, driving over the already harvested kuffar, and continue crushing their remains until it becomes physically impossible to continue by vehicle. At this stage, one may exit the vehicle and finish his operation on foot, if he was able to obtain a secondary weapon."

"Having a secondary weapon, such as a gun or a knife, is also a great way to combine a vehicle attack with other forms of attacks. Depending on what is obtained, the kill count

7

can be maximized and the level of terror resulting from the attack can be raised. This could also increase the possibility of attaining shahadah, which is the best of departures from this Dunya into the larger expanse of the Akhirah."

12. Based on my experience, the behavior displayed by ARTAN during this attack and information found on his Facebook page is consistent with someone who may have been motivated or inspired by social media postings or through direct contact with others on social media to commit acts of violence for the purpose of committing a terrorist attack on behalf of ISIL. Evidence of terrorist motivations or other criminal intent is being sought as well as any evidence of a conspiracy to commit terrorist acts, potentially involving additional accomplices.

## PRIVATE MESSAGING/SOCIAL APPLICATIONS

13. Based on the Affiant's training and experience, cellular telephones, such as the Subject Device, routinely includes applications for a variety of social media platforms, such as Facebook, which as detailed below, can be used to communicate with others.

14. Affiant knows that Facebook is a free-access social networking website of the same name that can be accessed at http://www.facebook.com or through a mobile Facebook application. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public. Additionally, Facebook users can exchange private messages on Facebook with other users. Facebook also has a Chat feature that allows users to send and receive instant messages through Facebook.

15.     Based on FBI analysis, ARTAN's telephone number 614-815-0162 is likely associated with an unknown Viber and WhatsApp Messenger account. Based on FBI analysis, one of ARTAN's email addresses, artan.2@osu.edu, is likely associated with an unknown Skype account. Based on the Affiant's training and experience, Affiant knows that individuals often use phones, especially those like the Subject Device which permits the use of applications, to access applications such as Facebook, Skype, Viber, and WhatsApp.

16.     Based on the Affiant's training and experience, Affiant knows Skype is an application that provides video chat and voice call services. Users may exchange such digital documents as images, text, video and any others, and may transmit both text and video messages. Skype is accessed at www.skype.com and is available on desktop and laptop computers, as well as a mobile application for telephones.

17.     Based on the Affiant's training and experience, Affiant knows Viber is a cross-platform instant messaging and Voice over IP (VoIP) application used to exchange instant messages, as well as exchange images, video and audio media messages. Viber is accessed at www.viber.com and is available on desktop and laptop computers, as well as a mobile application for telephones.

18.     Based on the Affiant's training and experience, Affiant knows WhatsApp Messenger is a proprietary, cross-platform, encrypted instant messaging client for smartphones. It uses the Internet to make voice calls, video calls, send text messages, documents, PDF files, images, GIF, videos, user location, audio files, phone contacts and voice notes to other users using standard cellular mobile numbers. WhatsApp Messenger is accessed at www.whatsapp.com and is available on a mobile application for telephones.

9

19.     The following are common applications which ARTAN may or may not have on his phone: Paltalk and Threema.  Based on the Affiant's training and experience, Affiant knows Paltalk is a popular messaging application.  According to Paltalk's website, http://www.paltalk.com/features, it is a messaging application that is available for a variety of computers and mobile devices.  Paltalk offers instant private messaging and video chat with other individual users and in chat rooms.

20.     Based on the Affiant's training and experience, Affiant knows Threema is a popular messaging application.  According to Threema's website, https://threema.ch/en, it is an end-to-end encrypted messaging application that is available for mobile devices.  Aside from providing end-to-end encryption for messages, Threema is designed to generate as little data on servers as technically possible.  Threema offers full anonymity: users are not forced to provide any personal information, such as phone number or email address, in order to use Threema.  Due to the nature of the Threema mobile messaging application and its system architecture, the Affiant assesses that the only way to obtain messages sent and received through Threema is to access the subject phone.

21.     The target of the investigation is ARTAN, who, until his death, resided at an address known to your Affiant in Columbus, Ohio.  ARTAN's cellular telephone was an Apple iPhone 5s, Model A1453, IMEI: 352034064531307, telephone number 614-815-0162, the Subject Device.  The affiant knows the Subject Device belonged to ARTAN because the Subject Device was found in the vehicle driven by ARTAN during the attack.  During the FBI JTTF interviews of the family, the family members confirmed ARTAN's phone number was 614-815-0162.

10

22.     The Device is currently in the lawful possession of the FBI. It came into the FBI's possession in the following way: a Columbus Police Officer, who is assigned to the FBI Violent Crime Squad, seized the telephone initially from the driver side floorboard of ARTAN's vehicle. The officer obtained a state warrant to search the telephone. The officer unsuccessfully attempted to use ARTAN's fingerprints to open the phone. Subsequently, the FBI JTTF assumed custody of the telephone. Therefore, while the FBI might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

23.     The Device is currently in storage at FBI Cincinnati Division, Columbus RA, 425 W. Nationwide Blvd., Columbus, OH. In my training and experience, I know that the device has been stored in a manner which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Subject Device first came into the possession of the FBI.

## TECHNICAL TERMS

24.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a.     Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call

log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.      IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic— that is, frequently changed—IP addresses.

c.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and

12

international borders, even when the devices communicating with each other are in the same state.

d.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

e.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a

13

special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

25.     Based on my training, experience, and research, I know that the subject device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

27.     _Forensic evidence._ As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the subject phone was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the subject phone because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a

14

paragraph that has been deleted from a word processing file).

b.      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

28.     <u>Nature of examination</u>. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

15

29.    <u>Manner of Execution</u>.  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**CONCLUSION**

30.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to see the items described in Attachment B.

31.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711(3)(A)(i), 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated.

32.    Finally, your Affiant respectfully requests that this Court order that the government is allowed to share the information obtained from this search (to include copies of digital media) with any government agency investigating, or aiding in the investigation of, this case or related matters.

16

Respectfully submitted,

T. Gregory Naples, Jr.
Special Agent
FBI – Joint Terrorism Task Force

SUBSCRIBED TO AND SWORN TO
BEFORE ME THIS 29th DAY
OF NOVEMBER, 2016

Honorable Elizabeth Preston Deavers
U.S. Magistrate Judge
Southern District of Ohio

17

## ATTACHMENT A

## DESCRIPTION OF PROPERTY TO BE SEARCHED

The property to be searched is an Apple iPhone 5s, Model A1453, Cell Phone (614-815-0162), IMEI 352034064531307, hereinafter the "Subject Device." The Subject Device is currently located at the FBI Cincinnati Division, Columbus Resident Agency, 425 W. Nationwide Blvd, Columbus, OH. This warrant authorizes the forensic examination of the Subject Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

All records on the Subject Device described in Attachment A that relate to violations of 18 U.S.C. § 2339B and involve ABDUL RAZAK ALI ARTAN since June 2014, including:

1) Address books, contact lists, calendars, appointments, and reminders;

2) Applications for web browsers, encrypted communication and social media to include but not limited to Facebook, Threema, Telegram, Paltalk, Tumblr and Twitter, including but not limited to IP addresses associated with those devices and applications;

3) Phone numbers and call history (including dialed, missed and received calls);

4) Text messages, chat sessions, instant messages, and MMS Data;

5) Usernames and passwords;

6) Photographs, images, notes, videos, audio files;

7) Phone identification information;

8) Internet usage history and internet based artifacts;

9) Emails and all internet based communication;

10) Documents (including all types of word processing and print processing versions), periodicals, spreadsheets, reports, databases, shortcuts, and bookmarks;

11) Log Files – including all transactional logs or records;

12) Operating System Files and Registry Files;

13) Deleted content including all types in the aforementioned list - any files or deleted data that is relevant to this investigation;

14) Evidence of user attribution showing who used or owned the Device at the time the

things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history; and

15) Records of Internet Protocol addresses used and of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.